

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-31-2001

# Banks v. Horn

Precedential or Non-Precedential:

Docket 99-9005

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Banks v. Horn" (2001). *2001 Decisions.* Paper 252.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/252

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 31, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-9005

GEORGE E. BANKS,
          Appellant

v.

MARTIN HORN, Commissioner, PA Dept of Corrections;
JAMES PRICE, Superintendent of State Correctional
Institute Greene; RAYMOND J. COLLERAN,
Superintendent of State Correctional Institute Waymart;
COMMONWEALTH OF PENNSYLVANIA

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 99-cv-00438)
District Judge: Honorable James F. McClure, Jr.

Argued April 2, 2001

Before: SLOVITER, ROTH and RENDELL, Circuit Ju dges

(Filed: October 31, 2001)

        Albert J. Flora, Jr., Esq. [ARGUED]
        33 West South Street
        Wilkes-Barre, PA 18701

        William Ruzzo, Esq.
        400 Third Avenue, Suite 109
        Kingston, PA 18704
         Counsel for Appellant
        George E. Banks

          Scott C. Gartley, Esq. [ARGUED]
          David W. Lupas, Esq.
          Office of District Attorney
          200 North River Street
          Luzerne County Courthouse
          Wilkes-Barre, PA 18711
           Counsel for Appellee
          Commonwealth of PA

          Peter Goldberger, Esq.
          Law Office of Peter Goldberger
          50 Rittenhouse Place
          Ardmore, PA 19003-2276
           Counsel for Amicus-Appellant
          PA Association of Criminal Defense
          Lawyers

          Louis M. Natali, Esq. [ARGUED]
          Turner & McDonald
          1725 Spruce Street
          Philadelphia, PA 19103
           Counsel for Amici-Appellants
          PA Association of Criminal Defense
          Lawyers and Louis M. Natali

OPINION OF THE COURT

RENDELL, Circuit Judge.

George Banks was convicted by a Luzerne County,
Pennsylvania jury of having committed thirteen murders,
and was sentenced to death. His direct appeals and filings
under the Pennsylvania Post-Conviction Relief Act ("PCRA")
failed. He sought habeas corpus relief in the District Court
under 28 U.S.C. S 2254, which was denied. He comes
before us now to appeal the District Court's ruling.

We have jurisdiction over this appeal pursuant to 28
U.S.C. SS 1291 and 2253. The District Court granted a
certificate of appealability as to whether the sentencing
phase instructions and forms violated Mills v. Maryland,
486 U.S. 367 (1988), under our precedent in Frey v.
Fulcomer, 132 F.3d 916 (3d Cir. 1997), cert. denied, 524

U.S. 911 (1998). By order entered June 27, 2000, we agreed to expand the certificate of appealability to include the issue of whether Banks failed to make a knowing, intelligent, and voluntary waiver of his Sixth Amendment right to counsel.

Because Banks's habeas corpus petition was filed after April of 1996,[1] the role of the District Court in reviewing the state court proceedings was governed by AEDPA.[2] Accordingly, the District Court's task was to determine whether the state court's decision was either contrary to or an unreasonable application of Supreme Court precedent. The District Court found no basis on which to dispute the state court's ruling. Because the question of whether the District Court appropriately applied the AEDPA standard of review is a question of law, we review its conclusions in that regard de novo. Berryman v. Morton, 100 F.3d 1089, 1095 (3d Cir. 1996).

A. DISCUSSION

On September 25, 1982 in Wilkes-Barre, Pennsylvania, Banks shot fourteen people with a Colt AR-15 semi-automatic rifle, killing thirteen and wounding one. The AR-15 is a civilian version of the military's M-16 rifle. Banks began his deadly spree at his own home, where he shot and killed three of his girlfriends and their five children, four of whom Banks himself had fathered. Banks then left his home clad in what appeared to be military fatigues. On the street outside he happened upon a group of bystanders who had heard the shots. Banks shot and killed one, a

_____

1. We discuss our view of the applicability of AEDPA specifically at 6-7, infra.

2. 28 U.S.C. S 2254(d) states:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

3

young man who had recognized him, and also shot and seriously wounded another. Banks then carjacked a car and drove to a trailer park, where he shot another girlfriend, their son, a second boy, and the girlfriend's mother. Two other boys survived the attack. After a stand-off at a friend's house, Banks surrendered.

At trial, the defense offered psychiatric experts who testified that Banks, who is bi-racial, suffered from paranoid psychosis and was convinced that he was a victim of a racist conspiracy. The theory was offered that he killed his children to save them from suffering racism as he had. Banks testified on his own behalf and insisted on referring to graphic, gruesome pictures of the murders to try to show that there was a government conspiracy against him. Banks alleged that his shots had only wounded, not killed, some of the victims, and that the police had fired the lethal shots, after which some of the bodies were moved. He also alleged that the medical examiner covered up some wounds and enlarged or altered others to distort the information presented to the jury. He sought throughout the trial to exhume the bodies.

Banks was convicted by a state court jury of twelve counts of first degree murder, one count of third degree murder, criminal attempt to commit murder, two counts of recklessly endangering another person, robbery and theft by unlawful taking or disposition. In the penalty phase, the jury sentenced Banks to death and imprisonment.

Banks filed direct appeals and sought collateral relief in the state courts, as well as filing for federal habeas corpus relief. We need not detail all these proceedings, except that one aspect of the procedural posture of the case deserves attention. The government had argued to the District Court that Banks's habeas corpus petition was not filed in a timely manner. Under AEDPA, Banks was required to file his petition within one year of April 24, 1996, unless the deadline was equitably tolled during the time a "properly filed" state petition for relief was pending. The government contended that because Banks's state court PCRA petition was filed late, it should not be deemed to have been "properly filed" for purposes of the tolling provisions under the federal statute. See 28 U.S.C. S 2244(d)(2). The

4

government based its argument in part on Lovasz v. Vaughn, 134 F.3d 146, 148 (3d Cir. 1998) ("We believe that a `properly filed application' is one submitted according to the state's procedural requirements, such as the rules governing the time and place of filing.").

The government relied on the Pennsylvania Supreme Court's ruling in 1999 that the requirement for timely filing was "jurisdictional," rather than merely a statute of limitations. See Commonwealth v. Banks, 726 A.2d 374, 376 (Pa. 1999) ("Banks VI"). The District Court did not accept that argument, however, noting that Banks could not be said to have been on notice prior to the Pennsylvania Supreme Court's holding in Banks VI that the Commonwealth would consider S 9545(b) to be jurisdictional, and that, especially in light of relaxed waiver in capital cases, and the policy of equitable tolling, Banks should not be barred because he reasonably could have construed the time requirement as procedural only. See Banks v. Horn, 63 F. Supp. 2d 525, 533–34 (M.D. Pa. 1999) ("Banks VIII"). The District Court noted that since the exceptions allowed courts to hear some untimely petitions, not every provision in the statute could be jurisdictional, and, absent clear jurisdictional language, it is"entirely reasonable to conclude that S 9545(b) is a statute of limitations rather than a jurisdictional provision." Id. at 533. In Banks VI, the Pennsylvania Supreme Court cited to its decision in Commonwealth v. Peterkin, 722 A.2d 638 (Pa. 1998), petition for habeas corpus dismissed sub nom. Peterkin v. Horn, 34 F. Supp. 2d 289 (E.D. Pa. 1998), which states simply that the "General Assembly amended the PCRA to require that, as a matter of jurisdiction, a PCRA petition must be filed within one year of judgment," but the statement was not the court's holding, and the court did not elaborate on the reasoning underlying its conclusion. Peterkin, 722 A.2d at 641. Banks VI was the first time the Pennsylvania Supreme Court held that a court was deprived of jurisdiction when the deadline was not met. As the District Court noted, by concluding that the time limitation was jurisdictional, the Pennsylvania Supreme Court thought it was foreclosed from applying the relaxed waiver standard in Banks's case. 63 F. Supp. 2d at 533.

5

Banks argues that, quite apart from the issue of how the "properly-filed" requirement of 28 U.S.C.S 2244(d)(2) is construed, we should consider his habeas petition as properly before us. First, he urges that because his first petition was filed pre-AEDPA he is not bound by AEDPA's provisions. In the alternative, he takes the position that the issue of timeliness of his habeas petition is not even before us on appeal since the government has not challenged the District Court's ruling in its counterstatement of issues, and has failed to discuss the issue in its brief, except for its conclusory reference to its position in a footnote.

Banks argues that his habeas petition was timely because it was not governed by AEDPA's one-year limitation period, but, rather, by pre-AEDPA law. In support of this theory, Banks urges that the habeas petition he filed in the District Court after AEDPA merely reasserted claims previously filed pre-AEDPA, so that it "relates back to the original filing date of Banks' pre-AEDPA petition." We disagree. The applicability of AEDPA does not turn upon a comparison of claims in successive petitions. It is, rather, governed solely by the date of the petition's filing. See, e.g., Hull v. Kyler, 190 F.3d 88, 103 (3d Cir. 1999); Jones v. Morton, 195 F.3d 153, 160-61 (3d Cir. 1999). Any petition that is filed subsequent to AEDPA is governed by AEDPA standards. In his argument, Banks relies on Coss v. Lackawanna Cty. Dev. Auth., 204 F.3d 453 (3d Cir. 2000).3 But Coss involved a unique factual setting in which Coss's petition was pending pre-AEDPA, and while it was pending, Coss filed another petition solely to remove the claims that the district court had held unexhausted. We thus viewed the second petition as "tantamount to a further amendment or clarification to the initial petition, filed at the direction of the District Court. . . ." 204 F.3d at 461. We were addressing the merits of his pre-AEDPA petition. If, instead, Coss's petition had been dismissed, and he had then filed either an identical petition or a petition absent the unexhausted claims after AEDPA's effective date, we would have been compelled to find that AEDPA controlled. Once a

_____

3. The Supreme Court reversed and remanded on grounds not at issue here. See Lackawanna Cty. Dist. Atty. v. Coss , 531 U.S. 923 (2001).

petition has been dismissed, a subsequent petition is a new petition and is governed by AEDPA.

As to Banks's contention that the issue as to whether his petition is time-barred is not before us because of the government's failure to specifically raise and brief the issue by way of cross-appeal, we believe that, in light of the District Court's careful analysis of this issue and its importance, and because the government did make reference to the issue albeit in a footnote -- we should examine whether the statutory filing requirements were met. Silber v. United States, 370 U.S. 717, 717-18 (1962).4

Should Banks's second state court PCRA filed in January 1997 be deemed properly filed such that the one-year AEDPA filing requirement did not begin to run until the Pennsylvania Supreme Court finally ruled on it in March 1999? If so, then Banks's habeas petition was filed in time. If not, then we need to decide whether the AEDPA one-year period barred his petition or whether it should be equitably tolled.5

It seems clear that, technically, Banks's filing of his second PCRA in January 1997 was too late under Pennsylvania law. This is because the Pennsylvania legislature had enacted legislation in November 1995 requiring all petitions, including second or successive

_____

4. Even if not raised, we believe we could consider this issue sua sponte. "While ordinarily we do not take note of errors not called to the attention of the Court of Appeals nor properly raised here, that rule is not without exception. The Court has `the power to notice a`plain error' though it is not assigned or specified,' . . . `In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings.' " Silber, 370 U.S. 717-18 (internal citations omitted) See also Acosta v. Artuz, 221 F.3d 117 (2d Cir. 2000); Kiser v. Johnson, 163 F.3d 326 (5th Cir. 1999).

5. We note that the Supreme Court's recent ruling in Duncan v. Walker does not bear on this issue because here, unlike the situation in Duncan, the time period was violated unless there is equitable tolling for the state proceedings, even if the time during which Banks's first federal habeas petition was pending is taken into account. ___ U.S. ___, 121 S. Ct. 2120 (June 18, 2001).

7

petitions, to be filed within one year of the final order on direct appeal unless certain exceptions were met. 6 42 Pa. Cons. Stat. S 9545 (Act of November 17, 1995, Special Session No. 1 P.L. 1118, No. 32, effective in 60 days).

However, was the petition therefore necessarily not "properly filed"? While we could explore this concept under the applicable Pennsylvania law and under the federal habeas case law, see, e.g., Artuz v. Bennett, 531 U.S. 4 (2000), we need not do so, because we conclude that, even were we to decide that the late filing of Banks's second PCRA rendered it not "properly filed," the District Court appropriately called on equitable principles to toll the one-year AEDPA requirement given this unusual fact pattern. Here, as the District Court points out, the state of the Pennsylvania law regarding the nature of the filing

_____

6. The text of the relevant statutory provision is:

(B) TIME FOR FILING PETITION.--

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

(2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been

presented.

(3) For purposes of this subchapter, a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review.

8

requirement was unclear, and Banks could reasonably have viewed the state time limit as a mere statute of limitations subject to equitable tolling, not, as the Pennsylvania Supreme Court later held in Banks VI, a jurisdictional requirement. The District Court noted that viewing this later ruling as a bar would result in unfair forfeiture without notice. Banks VIII at 534. This circumstance provides a basis for us to call on equitable principles in application of our own federal time parameters -- the one-year AEDPA requirement.

We have recently had occasion to examine this issue. In Fahy v. Horn, we described the state of the law at the time of Fahy's fourth PCRA petition, which was also the time period when Banks's petition was pending, as "inhibitively opaque." 240 F.3d 239 (3d Cir. 2001), cert. denied, 2001 WL 825957 (October 1, 2001). We noted that in Banks, we had required Banks to return to state court because even we believed the relaxed waiver rule might well apply. How can we expect Banks to have predicted the ultimate ruling of the Pennsylvania Supreme Court when we could not?

In Fahy we stated:

> When state law is unclear regarding the operation of a procedural filing requirement, the petitioner files in state court because of his or her reasonable belief that a S 2254 petition would be dismissed as unexhausted, and the state petition is ultimately denied on these grounds, then it would be unfair not to toll the statute of limitations during the pendency of that state petition up to the highest reviewing state court.

Fahy v. Horn, 240 F.3d at 245.

The same rule applies here. The Pennsylvania Supreme Court had denied Banks's first PCRA petition in March 1995, and he had filed his first habeas petition in February 1996. Thus, his federal action was pending when AEDPA was passed in April 1996. Because the district court determined that Banks's claims could be adjudicated and the petition was not subject to dismissal as mixed, it was not until the Third Circuit reversed that determination and ordered the petition dismissed as mixed in September 1997 that it would be equitable to begin calculating a delay in

9

filing against Banks, and because he filed his second PCRA petition while the appeal was still pending, there was no delay whatsoever. Subsequently, here, as in Fahy , Banks did not delay in seeking federal relief, filing his habeas petition two weeks after his state collateral proceedings were concluded. Thus, the equities are in his favor. Not only is there "no evidence of abuse of the process" by Banks, but it seems as clear as in Fahy's case that he "diligently and reasonably asserted his claims." Id. at 244–45. Accordingly, we conclude that the District Court was quite correct in its resort to equitable principles, and properly entertained Banks's petition on its merits, as we will as well.

B. ISSUES ON APPEAL

We granted Banks a Certificate of Appealability regarding two issues:

(1) Banks contends that the trial court erred in not having explored whether he was making a knowing, voluntary and intelligent waiver of his right to counsel during the trial. However, the District Court concluded that, by pursuing his own strategy at trial, Banks's situation was one of hybrid representation, but that there was no clear requirement under either United States Supreme Court precedent, nor under our case law, that a defendant "is entitled to an inquiry by the trial court before it exercises its discretion to permit hybrid representation." Banks VIII, 63 F. Supp. 2d at 543.

(2) Banks contends that the jury instructions and verdict sheets during the penalty phase violated Mills v. Maryland, and the Pennsylvania Supreme Court unreasonably applied the Supreme Court precedent in finding that his death sentence was not constitutionally infirm.7 The District Court rejected Banks's challenge,

_____

7. The District Court had granted a certificate regarding the Mills issue and we enlarged it to include the Sixth Amendment issue. Ouska v. Cahill–Masching, 246 F.3d 1036, 1045 (7th Cir. 2001). The Third Circuit's Local Appellate Rules provide: "If the district court grants a certificate of appealability as to only some issues, the court of appeals

reasoning that it was to evaluate whether Mills  applied only
to Banks's trial and direct appeal, and concluded that it did
not, since Banks's conviction became final before Mills was
decided and Mills has not been made retroactive by the
United States Supreme Court. The District Court further
distinguished our holding in Frey v. Fulcomer , 132 F.3d 916
(3d Cir. 1997), reasoning that Frey involved a pre-AEDPA
petition. Id. at 543-44.

We will address these issues in turn.

(1) Waiver of Representation of Counsel

Banks urges that the trial court should have conducted
a colloquy with him, establishing that he knowingly and
voluntarily waived his right to counsel before allowing
Banks to engage in certain conduct during the trial,
contrary to the advice of his counsel. Banks was
represented throughout the proceeding, but he contends
that he took over certain "core functions" at times, such
that a colloquy was required.

Clearly, Banks and his counsel disagreed as to whether
he should testify, and as to the scope of the testimony.
Banks wanted to testify because he believed that it was
critical for him to expose the conspiracy that he urged
resulted in the deaths and in altered injuries to those he
was accused of killing. During his testimony, therefore,
Banks introduced the coroner's reports and photographs
that had been ruled inadmissible prior to trial. Although
counsel and the trial court warned Banks that the pictures
were inflammatory, and that his testimony about the
pictures and his showing them to the jury would allow the
prosecutors to use them as well, Banks insisted that he
was "forced into this," and that the pictures were "part of
my evidence to the fact that they've twisted everything
around."

_____

will not consider uncertified issues unless petitioner first seeks, and
the
court of appeals grants certification of additional issues." 3d Cir. R.
22.1(b).

We note that the issue of Banks's competency to stand trial was
previously litigated on appeal and is not before us.

Banks also, and again contrary to the advice of counsel, insisted that the medical examiners be questioned about details and supposed inconsistencies in the photographs. The colloquy between counsel and the trial court before the recall of one of the medical examiners is telling:

> Defendant: [T]hey're asking me to do the questioning. I prefer not to, because I'm not qualified to do it.
>
> The Court: Then I will ask you to consult with counsel and I will ask counsel to prepare and ask the questions.
>
> [Defense counsel]: Your Honor, the three of us have reviewed this, and we can't conceive of any questions to ask the doctor.
>
> The Court: Mr. Banks will discuss with you the questions he proposes to ask, and I think counsel should ask the questions.

Banks himself also cross-examined a deputy coroner and a police officer.

There is no question that the defendant's testimony and the introduction of the previously excluded photographs were, as the Court predicted, inflammatory. There is also no question that the testimony, the introduction of the photographs, and the examinations of the witnesses were contrary to the advice of counsel, and eroded the protections counsel had secured for Banks prior to trial. We note that the trial court warned Banks repeatedly of his need to adhere to the rules of the court and insisted that where the rules of evidence and procedure were concerned it would "treat [Banks] like a lawyer," and that one could infer from the court's phrasing that Banks was to some extent acting as his own counsel. At no point, however, did Banks request that counsel withdraw and that he be allowed to proceed pro se.

The issue that Banks has presented to us is whether, even absent an affirmative declaration of a desire to proceed pro se, his actions were so contrary to counsel's advice and involved such significant control over his defense as to render him effectively unrepresented, and whether, if we so find, the trial court should have

12

concluded that Banks was effectively proceeding pro se and should have conducted a Sixth Amendment waiver inquiry before allowing Banks to testify. The issue that we must actually resolve, however, is much more circumscribed, because of the scope of review under AEDPA. That is to say, our analysis is limited to whether the court failed to apply, or misapplied, clearly established U.S. Supreme Court precedent. The first step in our analysis, therefore, is to define whether any U.S. Supreme Court precedent mandated -- either directly or by extension to these facts -- that the trial court personally ensure that Banks was making a voluntary, intelligent, and knowing waiver of his Sixth Amendment right to counsel in a setting such as this. We note that the trial court did discuss certain rights with Banks before he testified:

> Mr. Banks, once again, I will preface my remarks by saying this is not a lecture. This is a responsibility I have as a trial judge, to be assured that you understand the rights that you have and the rights, by testifying, that you'll give up.

In the course of this discussion, the court advised Banks that he had a right not to testify and that he could be prejudiced if he disregarded counsel's advice by his testimony and by introducing exhibits as part of his testimony. But the court never specifically inquired as to a waiver by Banks of his Sixth Amendment right to counsel:

> You understand, do you not, that the procedure is that counsel ask questions? May I suggest to you then that I will give you some time. You will consult with your counsel, so that you may give them the questions, so that they can properly phrase them for you.
>
> Let me caution you on another matter that might come up. You understand if you propose to use any exhibits, that you will be required to comply with the rules of evidence concerning exhibits.

The court did inquire whether Banks understood that he was not required to testify, that he had a constitutional right to remain silent, and that by testifying he would give up the right to remain silent. When Banks asked if he could continue to rely on the Fifth Amendment, the court

13

explained to him that he could not, assuring Banks that "I don't want you to do anything that will harm you." The court further explained that the testimony might open avenues for questioning that would otherwise remain closed and urged Banks to follow counsel's advice. Throughout the discussion, Banks remained adamant that he wanted to testify. Thus, in evaluating the case law we are not assessing the quality of the inquiry made by the trial court, but only whether an inquiry specific to the waiver of counsel was mandated.

The two Supreme Court opinions referenced by the parties, Faretta v. California, 422 U.S. 806 (1975), and McKaskle v. Wiggins, 465 U.S. 168 (1984), reh'g denied, 465 U.S. 1112, address situations that are different from the case before us, not only on the facts, but also on the principles that informed the Court's decisions. Faretta recognizes that a defendant who indicates a desire to represent himself and proceed without counsel has the right to do so, as long as he knowingly and intelligently waives his right to counsel. The defendant in Faretta wanted to manage his own defense; he did not want counsel to act on his behalf. The issue before the court was the extent to which a defendant has the right to present his own defense. The Court concluded that "the defendant . . . must be free personally to decide whether in his particular case counsel is to his advantage." 422 U.S. at 834. That decision must be honored by the court, even if the choice is detrimental, "out of `that respect for the individual which is the lifeblood of the law.' " Id. (quoting Illinois v. Allen, 397 U.S. 337, 350–351 (1970), reh'g denied, 398 U.S. 915).

The Court recognized that managing one's own defense results in the relinquishment of "the traditional benefits associated with the right to counsel." 422 U.S. at 835. It is the relinquishing of these benefits that triggers the requirement of a knowing, voluntary, and intelligent waiver. Id. at 835.

In McKaskle v. Wiggins, 465 U.S. 168 (1984), reh'g denied, 465 U.S. 1112, the Supreme Court addressed the scope of the right to conduct one's own defense, holding that this right was not violated by the unsolicited participation of standby counsel. Again, the focus of the

14

Court was on determining to what extent a court could circumscribe a defendant's right to present his own defense. The Court found that the appointment and limited participation of standby counsel was not inconsistent with the "dignity and autonomy of the accused." Id. at 177. The Court noted that a "defendant does not have a constitutional right to choreograph special appearances by counsel." Id. at 183. The interest of the court in appointing standby counsel is to assist the defendant to comply with court rules and protocol and enable him to achieve"his own clearly indicated goals." Id. at 184.

While McKaskle provides guidance to courts as to where the line is crossed between the assistance or enabling of standby counsel to an already pro se defendant and impermissible intrusion, it does not provide any guidance to courts for the reverse situation, i.e., when does a defendant who is represented by counsel cross the line from being represented to proceeding pro se? We cannot say that either Faretta or McKaskle, both affirmations of the liberty and autonomy rights of a defendant, define a line of self-expression that defendants cannot cross without the court's securing of a knowing, voluntary and intelligent waiver.

Banks agreed to the continued representation by his counsel throughout trial, and while he performed some tasks contrary to counsel's advice, he never did so unattended or unadvised by counsel. In fact, it is clear from the record that he received counsel's advice on an ongoing basis. A disagreement between counsel and a defendant is not enough in itself to render a defendant pro se. Hakeem v. Beyer, 990 F.2d 750, 765 (3d Cir. 1993). Accordingly, the cases requiring a waiver colloquy when the defendant indicates a desire to proceed pro se do not in themselves dictate such a procedure here.

Moreover, to the extent that Banks has urged that the right to testify on one's behalf -- which was perhaps the most troubling of Banks's strategic decisions -- should be somehow constricted if necessary to ensure Sixth Amendment rights, this seems to run directly counter to Faretta, and its focus on an individual's right to control his defense. Faretta, 422 U.S. at 834. Further, we know of no

15

case that interposes a requirement of a colloquy in connection with the right to testify on one's own behalf.8

The Pennsylvania Supreme Court's analysis focused solely on Banks's decision as an exercise of his right to testify on his own behalf. It did not view Banks's choices as implicating his Sixth Amendment rights.9  Banks says that this analysis is contrary to a line of cases that stand for the proposition that such a colloquy is required when there is "hybrid representation," that is, where an attorney and a defendant each address the court or in other ways share defense functions.10

In the typical hybrid representation, a trial court acts in its discretion to appoint standby counsel for a pro se defendant who later challenges the attorney's role as overly intrusive under Faretta's right to self-representation. See, e.g., McKaskle v. Wiggins, 465 U.S. 168 (1984), reh'g denied, 465 U.S. 1112. Some federal courts have opined that a colloquy should be conducted when the defendant assumes "core functions" of the defense.

> When the accused assumes functions that are at the
> core of the lawyer's traditional role . . . he will often
> undermine his own defense. Because he has a

_____

8. In Boardman v. Estelle, the Ninth Circuit analogized a right to allocution to the right to testify in one's own behalf and characterized them as "entirely separate. . . . A defendant who elects representation by counsel does not simultaneously waive his right to testify at trial." 957 F.2d 1523, 1528 (9th Cir.), cert. denied , 506 U.S. 904 (1992). Likewise, the exercise of one's personal right to testify is not tantamount to proceeding pro se.

9. The dissent in Banks II, however, both viewed the issue as raising Sixth Amendment concerns and viewed the trial court as violating Banks's Sixth Amendment rights. See discussion, infra at n. 11."

10. Interestingly, Banks's approach to this issue seems to have come full circle and, at oral argument, his counsel argued the issue precisely as the Pennsylvania Supreme Court had characterized it, namely, as a duty to prevent Banks from testifying. And, in its brief, it quotes the extensive colloquy between Banks and the trial court before, and during, his testimony, and urges that the court should have mentioned the right to counsel and warned of inherent danger in waiving counsel. We find no support for the proposition under Faretta or McKaskle, nor has any Supreme Court case been referenced as authority for this proposition.

16

> constitutional right to have his lawyer perform core
> functions, he must knowingly and intelligently waive
> that right.

United States v. Kimmel, 672 F.2d 720,721 (9th Cir. 1982). But see United States v. Leggett, 81 F.3d 220 (D.C. Cir. 1996) (cross-examination of some witnesses, asking of questions of defense counsel, proposing questions for other witnesses and delivering closing argument did not require the trial court to give waiver warnings); see also Bontempo v. Fenton, 692 F.2d 954, 960 (3d Cir. 1982), cert. denied, 460 U.S. 1055 (1983) (supplemental closing statement); Robinson v. United States, 897 F.2d 903, 906-07 (7th Cir. 1990) (same).

As we have noted, under the standards of Williams v. Taylor, 529 U.S. 362 (2000), we may challenge the state court analysis only if it is contrary to or unreasonably applies clearly established federal law. It is unclear whether it must be stated in Supreme Court precedent, or whether it may be derived from principles enunciated in Supreme Court precedent. Id. at 408-09 ("Today's case does not require us to decide how such `extension of legal principle' cases should be treated under S 2254(d)(1)."). Regardless, we conclude that the federal decisions do not apply so directly to the facts at hand so as to constitute an extension of principles enunciated in Supreme Court precedent. The lack of clearly applicable principles in such precedent is fatal to Banks's argument. While the decisions Banks cites might inform our decision were we reviewing a district court trial, we are not here engaged in"the broad exercise of supervisory power" that we would possess over a district trial court decision. Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974) (quoting from the appellate court opinion, 473 F.2d 1236, 1238 (1st Cir. 1973)). See, e.g., United States v. Davis, 2001 WL 1173337 (5th Cir. October 4, 2001) (reversing the district court's handling of hybrid representation situation).

The Supreme Court has never addressed a situation such as this, let alone indicated that the situation would implicate a Sixth Amendment right in the same way as defendant's right to proceed without counsel, or the prerequisites to a defendant's proceeding pro se. Banks did

17

not reject the assistance of counsel; he acted with counsel's assistance, but chose to reject the advice of counsel. Although we have found some federal decisions that have adapted the case law to "hybrid" factual settings, we find none of these rulings to be persuasive extensions of U.S. Supreme Court precedent so as to constitute clearly established law regarding Sixth Amendment violations in such a fact pattern.11 Further, many of the decisions are

_____

11. We note that Banks cites several Pennsylvania cases that he contends bear on the issue before us: Commonwealth v. Bell, 276 A.2d 834 (Pa. 1971); Commonwealth v. McGrogan, 297 A.2d 456 (Pa. 1972); Commonwealth v. Palmer, 462 A.2d 755 (Pa. Super. 1983). In one, the Pennsylvania Supreme Court stated that the introduction of evidence is a function that is allocated solely to counsel. Commonwealth v. Bell, 276 A.2d 834 (Pa. 1971). In Banks I, Chief Justice Nix dissented, and was joined in his dissent by Justice Zappala, because he concluded that, in accordance with Bell, Banks had assumed a function allocated to counsel and "was acting as his own attorney and was representing himself." 521 A.2d at 23. While Chief Justice Nix's interpretation of Pennsylvania case law would require a waiver colloquy so as to afford federal constitutional protections, his was not the majority opinion. None of the Pennsylvania cases referred to us by Banks appears to be directly on point. Further, it is not our province to determine whether the Pennsylvania Supreme Court's decision was contrary to, or an unreasonable application of, its own precedent, but, rather, of clearly established federal precedent.

The three federal cases that Banks cites in addition to McKaskle and Faretta as defining an "exclusive province of counsel" at trial are inapposite. Jones v. Barnes, 463 U.S. 745 (1983) is concerned exclusively with whether appellate counsel is obligated to raise all nonfrivolous claims proffered by the appellant. See id. at n. 7. In Vess v.
Peyton, 352 F.2d 325 (4th Cir. 1965), cert. denied, 383 U.S. 953 (1966), the Fourth Circuit affirmed the district court's determination that there was no error in appellant's not having been provided counsel at a preliminary hearing (a determination that is no longer good law) and that the record supported the conclusion that appellant's guilty plea was knowingly and voluntarily offered. The court also rejected appellant's contention that the failure to call certain witnesses suggested by the defendant did not constitute inadequate representation of counsel. Likewise, Buckelew v. United States, 575 F.2d 515 (5th Cir. 1978) rejected a claim that an uncalled out-of-state witness constituted ineffective assistance of counsel. None of these cases could be read to mandate that a trial judge treat defendant's insistence upon testifying, and his introduction of evidence as part of that testimony –- or even the directing and conducting of the cross-examination–- as an assertion of a right to proceed pro se.

18

unpublished and have no precedential value.[12] Accordingly, we agree with the District Court that Banks is not entitled to habeas relief on this ground.

## (2) Application of Mills v. Maryland in the Penalty Phase

Banks contends that the Pennsylvania Supreme Court determination regarding the jury instructions and verdict slip during the penalty phase involved an unreasonable application of Mills v. Maryland, 486 U.S. 367 (1988). The District Court did not disturb the Pennsylvania Supreme Court's ruling regarding the penalty phase, reasoning that Mills v. Maryland was not retroactive, and also stating in summary fashion that "Supreme Court precedent (in the form of Mills and McKoy) did not require an outcome contrary to that reached by the state courts." Banks VIII at 544. We disagree with both conclusions.

### (a) Does Mills Apply?

We first note that the District Court apparently misperceived the way in which the AEDPA standard applies to the relevant state court proceeding. The Court stated that the Mills decision was rendered in 1988, five years after Banks's conviction and sentence.

However, the point in time at which the Supreme Court jurisprudence must have been "clearly established" is at the time that the state court makes the ruling on the federal constitutional issue that is being scrutinized. The Pennsylvania Supreme Court issued its opinion in Banks II, construing Mills in 1995, eight years after Mills became law. If the Pennsylvania Supreme Court had questioned whether Mills was applicable to the trial court's conduct, we would have needed to inquire whether Mills codified law that was clearly established at the time of the trial. But that is not the question before us. AEDPA defines the parameters of federal court review of state determinations of federal law.

_____

12. See, e.g., Robinson v. United States, 897 F.2d 903 (7th Cir. 1990); United States v. Parker, 176 F.3d 486 (9th Cir. 1999) (unpublished); Islam v. Miller, 166 F.3d 1200 (2d Cir. 1998) (unpublished); United States v. Demeke, 152 F.3d 921 (2d Cir. 1998) (unpublished).

19

In the Pennsylvania Supreme Court opinion, it applied Mills. We are being asked to determine whether that application of Mills was contrary to, or an unreasonable application of, clearly established federal law. To make that determination, it is only the state court's decision that cited to Mills and the law as it was clearly established then, in 1995, not the law at the time of Banks's sentencing, that matters.

### (b) Are We Compelled to Conduct a Retroactivity Analysis under Teague?

The Commonwealth also argues that we should not apply the lessons of Mills to Banks's case, because Banks's conviction became final before Mills was decided, and because the Pennsylvania Supreme Court has consistently decided that Mills is not retroactive. Under Teague v. Lane, 489 U.S. 288, 300 (1989), reh'g denied, 490 U.S. 1031 (1989), retroactivity is a "threshold question," because it is in that determination that a court establishes whether a rule enunciated on the basis of a set of facts will apply only prospectively or will be applied retroactively to all who are similarly situated. See id. at 299–301. 13 Retroactivity analyses can be complex, but here the analysis is not, because we do not need to focus on anything other than the reasoning and determination of the Pennsylvania Supreme Court. We acknowledge that the Pennsylvania Supreme Court has stated that it will not give retroactive effect to "new rules" handed down after a conviction has become final.14 We acknowledge further that the

_____

13. Because we find Teague not to govern our analysis, our discussion of its principles are limited to explaining why it is not controlling here, despite the arguments of the parties. We note, however, that recent decisions have called into question to what extent Teague has continued force independent of AEDPA. See, e.g., Tyler v. Cain, 121 S.Ct. 2478, 2483–84 (June 28, 2001) (rejecting application of the Teague exceptions to construe Cage, 498 U.S. 39 (1990) as retroactive under 28 U.S.C. S 2244(b)(2)(A)).

14. "[A] new rule of law will not be applied retroactively `to any case on collateral review unless that decision was handed down during the pendency of appellant's direct appeal and the issue was properly preserved there or . . . was nonwaivable.' " Commonwealth v. Cross, 726 A.2d 333, 338 (Pa. 1999) (quoting Commonwealth v. Gillespie, 516 A.2d 1180, 1183 (1986)).

20

Pennsylvania Supreme Court has specifically noted its skepticism regarding the retroactive application of Mills to cases other than non-final sentences, see, e.g. , Commonwealth v. Cross, 726 A.2d 333, 338 n. 4, (Pa. 1999), and that it disagrees with our ruling in Frey.15 See Cross, 726 A.2d at 337.

However, the ruling in Banks II is what determines the scope of our review, and in Banks II, the Pennsylvania Supreme Court held that, following its previous rulings in this area, the sentencing process did not violate Mills. To determine whether the Pennsylvania Supreme Court's ruling in Banks was contrary to, or involved an unreasonable application of, Supreme Court precedent, we do not need to undertake any retroactivity analysis, because, notably, the Pennsylvania Supreme Court undertook none. It examined the penalty phase on the merits based on Mills, making no reference to any concerns regarding Mills' applicability to the case. Banks II, 656 A.2d 470.

The government argues that if we are considering the applicability of a new rule (assuming Mills is a new rule -- which is not at all clear16), we must be guided by Teague v.

_____

15. The Pennsylvania Supreme Court has asserted that it has "concurrent jurisdiction" with this court"as to federal constitutional questions" and as such may "formulate its own interpretation of Supreme Court precedent, which may be in opposition to that stated by the lower federal courts." Cross, 726 A.2d at 338 n. 4. At the same time, the United States Supreme Court has made it clear that a federal court must apply independent judgment in its interpretation of federal law and if, "after carefully weighing all the reasons for accepting a state court's
judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail." Williams, 529 U.S. at 389.

16. To the extent that Teague still provides the appropriate scheme for analysis, see supra n. 13, we note that the Sixth Circuit has explicitly found that Mills does not comprise a "new rule" under Teague. Gall v. Parker, 231 F.3d 265, 322 (6th Cir. 2000), reh'g and reh'g en banc denied; cert. denied, ___ U.S. ___, 121 S. Ct. 2577 (2001). Accord, DeShields v. Snyder, 829 F. Supp. 676, 688 (D. Del. 1993). Other courts have determined that it is immaterial whether Mills is a new rule, because, whether or not the rule is new, it falls within the second

21

Lane, 489 U.S. 288 (1989), and O'Dell v. Netherland, 521 U.S. 151 (1997), and refuse to apply such new rule unless one of the two narrow exceptions referenced in the case law applies.17 However, we conclude that we need not explore

_____

exception of Teague. See, e.g., Williams v. Dixon, 961 F.2d 448 (4th Cir.),
cert. denied, 506 U.S. 991 (1992). The Fifth and the Eighth Circuit, in contrast, have classified Mills as a new rule. See, e.g., Miller v. Lockhart,
65 F.3d 676, 686 (8th Cir. 1995); Cordova v. Collins, 953 F.2d 167, 173 (5th Cir.), cert. denied, 502 U.S. 1067 (1992). Both of these cases are distinguishable, however. In Cordova the Fifth Circuit summarily concluded that Teague precluded it from applying a decision announced after Cordova's conviction was final. The court supplied no analysis nor explanation to support its conclusion. 953 F.2d at 173. In Miller, only one of the four significant pre-Mills cases had been decided by the U.S. Supreme Court prior to Miller's conviction, and that decision, Lockett v. Ohio, 438 U.S. 586 (1978), was a plurality opinion whose fractured opinions were considered in Miller not to" `compel' the further holding that a unanimity requirement for mitigating circumstances is unconstitutional." 65 F.3d at 686. The other three decisions--that were decided prior to Banks's conviction becoming final--were Eddings v. Oklahoma, 455 U.S. 104 (1982) (applying Lockett in a 5-4 decision with two concurrences); Skipper v. South Carolina, 476 U.S. 1, 4 (1986) (characterizing the rules that a sentencer may not be precluded from considering any "aspect of a defendant's character or record and any of the circumstances of the offense" and "that a sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence" as well established; there were six justices in the majority and three concurring); Hitchcock v. Dugger, 481 U.S. 393 (1987) (unanimously holding that mitigating evidence was wrongly excluded from consideration).

17. The two exceptions are:

(1) "rules `forbidding criminal punishment o f certain primary conduct [and] rules prohibiting a certain category of punishment for a class of defendants because of their status or offense' " O'Dell v. Netherland, 521 U.S. 151, 157 (1997) (quoting Penry v. Lynaugh , 492 U.S. 302, 330 (1989));

(2) " `watershed rules' of criminal proce dure implicating the fundamental fairness and accuracy of the criminal proceeding." O'Dell at 157 (quoting Graham v. Collins, 506 U.S. 461 (1993), reh'g denied, 507 U.S. 968.).

As noted in supra n. 16, the Fourth Circuit has found Mills to fall within the second Teague exception.

22

the contours of Mills (and its predecessors) as to whether it is "new;" nor do we need to consider, as the parties have done, the applicability of the exceptions. This is because, as the brief of amici curiae notes,[18] resort to Teague is misplaced. Teague teaches that the federal courts in habeas corpus proceedings should be reluctant to apply new rules of federal jurisprudence in state court cases decided before such new rules were handed down. Principles of comity and finality counsel that we maintain a circumscribed scope of habeas review. Teague, 489 U.S. at 308. Here, however, as we have noted, the Pennsylvania Supreme Court applied Mills. We are examining the application of Mills, not because we wish to impose a new rule not considered by the Pennsylvania Supreme Court, but as the court in fact did consider and apply it.[19] In such a situation, Teague is not implicated. Accordingly, we need ask only whether the Pennsylvania Supreme Court's application of Mills should be disturbed under the AEDPA standards.[20]

> (c) The Pennsylvania Supreme Court's Application
> of Mills

We disagree with the District Court's refusal to address how the Pennsylvania Supreme Court applied Mills in Banks II. We do, however, agree with the District Court

_____

18. Brief of Amici Curiae, The Pennsylvania Association of Criminal Defense Lawyers and Louis Natali, Esq., Supporting Appellants. We are grateful to amici for their careful reasoning and research. Their brief was
thorough and expertly written; more, it was genuinely helpful.

19. As we reference below, the precise holding of the Pennsylvania Supreme Court was that "[n]either the jury instructions, the jury poll nor the verdict slips in the instant matter contained language which would violate the dictates of Mills." Banks II, 656 A.2d at 470.

20. The District Court never really addressed this issue because it concluded that neither Mills nor Frey should apply. However, since the parties have extensively briefed the issue before us, we will address it and decide it, rather than remanding to the District Court. Hein v. FDIC, 88 F.3d 210, 221(3d Cir. 1996), cert. denied sub nom. Hein v. McNeil, 519 U.S. 1056 (1997) ("To the extent that we can decide these issues as a matter of law without further factual development, we serve the interests of judicial economy as well as the interests of the parties in avoiding unnecessary re-litigation.")

23

that, in any event, our analysis would not be dictated by Frey –– which was pre-AEDPA –– but by the AEDPA standard. Thus, we must ask whether the Pennsylvania Supreme Court determination regarding the constitutionality of the instructions, verdict slip, and polling of the jury involved an unreasonable application of Mills.

The Pennsylvania Supreme Court relied on its own precedents to conclude that the sentencing proceedings in Banks did not violate Mills, dismissing each of Banks's contentions in turn. "This [jury] instruction, which mirrors the language found in the death penalty statute of our Sentencing Code, has previously been reviewed by this Court and determined not to violate Mills." Banks II, 656 A.2d at 470. "The form of verdict slip employed in the instant matter was virtually identical to that considered by this Court in Commonwealth v. Frey and determined not to infer to the jury a requirement of unanimity with respect to mitigating circumstances." Id. (Citation omitted). "Nor do the answers provided by the individual jurors during the poll suggest in any manner that they believed unanimity was required in finding mitigating circumstances." Id. The court then concluded, "In sum, neither the instructions of the court nor the printed instructions on the verdict slips nor the questions and responses of the court and jury during polling, standing alone or viewed in total, infer a requirement of unanimity which would violate the dictates of Mills." Id. at 471.

Consistently, the Pennsylvania Supreme Court relied on its own prior determinations in upholding Banks's sentencing proceedings. Our task is to review state court proceedings not to ensure the consistency of the Pennsylvania Supreme Court's application of its law, but, rather, to assure proper application of United States Supreme Court teachings. In Williams v. Taylor , the Supreme Court approvingly quoted the Seventh Circuit:

> Section 2254(d) requires us to give state courts' opinions a respectful reading, and to listen carefully to their conclusions, but when the state court addresses a legal question, it is the law `as determined by the Supreme Court of the United States' that prevails.

24

529 U.S. at 387 (quoting Lindh v. Murphy, 96 F.3d 856, 869 (7th Cir. 1996)).

The United States Supreme Court has provided ample guidance in this area. There are two overarching themes in Mills that are further clarified in Boyde v. California, 494 U.S. 370 (1990), reh'g denied 495 U.S. 924. First, if under the sentencing scheme it is possible for jurors to agree that mitigating circumstances exist, but, because of a lack of unanimity as to which mitigating circumstances exist, to conclude that they may not consider those circumstances, the sentencing scheme is unconstitutional. Mills , 486 U.S. at 374. Second, and related to the first, the critical question is not whether a constitutional construction is possible, but whether a reasonable jury could have interpreted the instructions in an unconstitutional manner, that is, as restricting them to finding only those mitigating circumstances as to which all can agree. Id. at 375-76. We conclude that the Pennsylvania Supreme Court failed to analyze the penalty phase of Banks's trial in accordance with these principles, and, as a consequence, unreasonably applied Mills. As Judge Padova recently pointed out in granting habeas relief in a very similar case, Hackett v. Price, 2001 WL 884721 (E.D. Pa. Aug. 6, 2001), the state court

> misconstrue[d] the court's task in examining for Mills error by focusing on the meaning of the statute rather than on the issue of jury confusion. As Mills  instructs, it is the danger of jury misinterpretation of the statutory scheme, rather than the existence of a constitutional interpretation of the statute by the courts, that creates the Mills problem.

Id. at *19.

We must conclude that the Pennsylvania Supreme Court ruling involved an unreasonable application of Mills.21 In
_____

21. Banks argues that, in fact, the determination was "contrary to" Mills, because it violated Mills' dictates. We think the better analysis, since the
Pennsylvania Supreme Court referenced Mills and seemed to be considering how it impacted the Banks case, is to rely on the "unreasonable application," which, in any event, is clearly evident.

25

fact, we conclude that the Pennsylvania Supreme Court ruled that there was no Mills violation without ever really applying the teachings of Mills, and by examining the statute, not the potential for confusion by jurors in what they were told to do. Further, as noted in Hackett, Mills itself involved a situation in which the statute had been interpreted to be constitutional, but the Supreme Court vacated the sentence based on the risk of confusion. Id. at 19.

We will examine each aspect of the Pennsylvania Supreme Court's analysis of the jury's involvement in the penalty phase -- the instructions themselves, the verdict slip, and the polling of the jury following the sentencing verdict.

### i. Jury Instructions

In Banks II, the Pennsylvania Supreme Court quoted three lines of the jury instructions:

> The sentence you impose will depend upon your findings concerning aggravating and mitigating circumstances. The Crime[s] Code in this Commonwealth provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstance or circumstances. The verdict must be a sentence of life imprisonment in all other cases.

656 A.2d at 470.

The court then opined that because the instruction "mirrors the language found in the death penalty statute of our Sentencing Code [that] has previously been reviewed by this court and determined not to violate Mills " Banks's claim was "without merit." Id.22 (citing Commonwealth v. Hackett, 627 A.2d 719 (1993); Commonwealth v. Marshall,

---

22. Hackett, as noted above, was recently vacated by the Eastern District of Pennsylvania. See 2001 WL 884721. Post-conviction relief was denied in O'Shea in 1999 at 726 A.2d 376, cert. denied, 528 U.S. 1119 (2000).

633 A.2d 1100 (1993), rearg. denied (1994); Commonwealth v. O'Shea, 567 A.2d 1023 (1989), cert. denied, 498 U.S. 881 (1990)).

In Hackett, the Pennsylvania Supreme Court had attempted to distinguish Mills based on the Maryland statute, reasoning that since the Maryland statute barred consideration of mitigating evidence unless there was unanimous agreement and the Pennsylvania statute required unanimity as to the absence of a mitigating circumstance, the Pennsylvania statute allowed individual jurors to prevent death sentences but not to compel them. See Hackett, 2001 WL 884721 at *19. The differences in the statutes were not enough to render the Pennsylvania statute constitutional, since the danger of jury misinterpretation was present in both statutes, and the Pennsylvania Supreme Court had examined only the statute, not the possibility that the jury had been confused by the instructions given. Boyde v. California , 494 U.S. 370 (1990), reh'g denied 495 U.S. 924, established that the jury instructions must be considered in the context of the entire proceeding, and the Pennsylvania Supreme Court's failure to do so was contrary to clearly established federal law. Id. at 21. Here, the Pennsylvania Supreme Court has essentially ignored the teachings of Boyde and engaged the same reasoning regarding the constitutionality of the instructions as in Hackett -- itself constitutionally defective.

Proper application of Mills requires at the outset that the reviewing court examine the entire jury instructions, posing the "critical question" whether a reasonable jury could have concluded from the instruction that unanimity was required to find a mitigating circumstance. Mills, 486 U.S. at 370. Also, the Boyde standard requires that the court view the instruction in its totality, not examine in isolation a few sentences that reference the Crimes Code. Boyde, 494 U.S. at 378.

In Boyde, the Supreme Court iterated the standard of evaluating jury instructions as "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence," Id. at 380, and it reiterates the Mills principle that jury

27

instructions must be carefully considered in their entirety. Mills, 486 U.S. at 384. "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Boyde, 494 U.S. at 378. In Banks II, the Pennsylvania Supreme Court never examined the jury instruction from that vantage point. Rather, it looked at one part of the instruction and found that it was acceptable because it tracked the permissible statutory provisions and did not "infer" a requirement of unanimity. 656 A.2d at 470. Its conclusion was based not on how a juror might interpret its content, but on its own previous statutory construction of the language at issue. Here, even more starkly than in Hackett, the Pennsylvania Supreme Court merely stated that the statutory language had been reviewed and "determined not to violate Mills." Banks II, 656 A.2d at 470. There was no further analysis.

We will juxtapose the instructions given by the trial court with those we found in Frey to be constitutionally defective.

28

Frey Instructions

Members of the jury, you must now decide whether this defendant should be sentenced to death or life imprisonment. The sentence will depend on your finding concerning aggravating and mitigating circumstances. The Crimes Code provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life in all other cases. Frey v. Fulcomer, 132 F.3d 916, 922 (3d Cir. 1997), cert. denied, 524 U.S. 911 (1998).

Remember that your verdict must be a sentence of death if you unanimously find at least one aggravating circumstances (sic) and no mitigating circumstances, or if you unanimously find

Banks Instructions

Members of the jury, you must now decide whether the defendant in this case is to be sentenced to death or to life imprisonment on seach of the Informations upon which you have returned a verdict of guilty of murder in the first degree.

The sentence you will impose will depend on your findings concerning aggravating and mitigating circumstances. The Crime Code in this Commonwealth provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstance or circumstances.

Remember, under the law of this Commonwealth, your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstance,

29

one or more aggravating circumstances which outweigh any mitigating circumstances. In all other cases, your verdict must be a sentence of life imprisonment. Id.

Now, the Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt. . . . The defendant has the burden of proving mitigating circumstances but only by a preponderance of the evidence. Id. at 923.

or if you unanimously find one or more aggravating circumstances which then outweigh any mitigating circumstances.

In all other cases, your verdict would be life imprisonment.

Once again, the Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt. The defendant has the burden of proving mitigating circumstances by a preponderance of the evidence.

If, after conscientious and thorough deliberations, you are unable to agree on your findings and your verdict, you should report that to me.

While, as we have noted, Frey does not control our holding here, nonetheless our reasoning there regarding the Mills implications of a very similar jury charge is instructive and applicable.[23] As we said in Frey:

Specifically, we must determine whether it is reasonably likely that the jury could have understood the charge to require unanimity in consideration of mitigating evidence. We need not determine whether the jurors did, in fact, understand the charge to require unanimity in consideration of mitigating evidence -- only whether it was reasonably likely. See

_____

23. In his brief Banks sets out the jury instruction in Frey alongside those given here, and notes that the instruction given here was even more egregious than in Frey in terms of its import regarding the need for the jurors to "agree" on their "findings." We agree.

30

Boyde, 494 U.S. at 380, 110 S. Ct. at 1197–98; Mills, 486 U.S. at 384, 108 S. Ct. at 1870.

Examining the language of the jury charge, we must answer in the affirmative. First and foremost, read in its entirety, the relevant portion of the jury charge emphasizes the importance of a unanimous finding, using the phrase frequently and in close proximity to -- within seven words of -- the mitigating circumstances clause. We describe the relevant portion of the sentence: "if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance. . . ." Considering this close proximity -- the clause is, to the ear and to the mind, one sound bite -- it is quite possible that a juror would, regardless of other qualifying language, believe that mitigating circumstances had to be found unanimously.

. . . .

Thus, the unanimity language in the Frey charge could only modify the term "find," and hence the jury could reasonably have believed that unanimity was required in both its ultimate and interim conclusions, especially given the close proximity we have described.

. . . .

Other parts of the Frey charge were more likely to increase the confusion rather than lessen it. As in Zettlemoyer, the Frey trial court made a point of instructing the jury on the relevant burdens of proof relating to both aggravating and mitigating circumstances.

. . . .

[But] Unlike Zettlemoyer, where the court specifically instructed the jury that aggravating circumstances must be proven "unanimously, beyond a reasonable doubt," the trial court here did not stress that the different burdens that attach to aggravating and mitigating circumstances also entail different unanimity requirements. A lay jury might plausibly conclude, therefore, that aggravating and mitigating

31

circumstances must be discussed and unanimously agreed to, as is typically the case when considering whether a burden of proof has been met. Such an understanding, however, is plainly inconsistent with the requirements of Mills, and adds to our concern that the jury could have understood the charge to require unanimity in consideration of mitigating evidence.

132 F.3d at 923–24.

These same concerns dictate the same result here. The instruction here, like the one we examined in Frey, runs afoul of Mills, and the Pennsylvania Supreme Court's assessment of the instruction involved an unreasonable application of Mills. The instructions are in themselves ambiguous, allowing for a jury to infer that the requirement of unanimity applies both to aggravating and mitigating circumstances. There is no way that a juror would understand that a mitigating circumstance could be considered by less than all jurors. Further, when the judge clarified the difference between aggravating and mitigating circumstances, he described the requirements for finding aggravating circumstances and then said:

> The defendant has the burden of proving mitigating circumstances by a preponderance of the evidence. The preponderance of the evidence is a lesser burden of proof than beyond a reasonable doubt. A preponderance of the evidence exists where one side is more believable than the other or, as has been explained to you, a preponderance exists whenever the scales tip ever so slightly.

A reasonable juror could readily infer from the fact that the distinctions between the burden of proof were explained, but no mention was made of a distinction between a requirement of unanimity for a finding of aggravating circumstances and the requirement for mitigating circumstances, that the same requirement of unanimity applied. The Banks court went on to stress:

> Remember, again, your verdict in each case must be unanimous. It cannot be reached by a majority vote or by any percentage. It must be the verdict of each and every one of you.

32

Considered as a whole, the jury instructions leave no doubt that "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde, 494 U.S. at 380.

ii. Verdict Slip

In its review of the verdict slip, the Pennsylvania Supreme Court noted that the form of slip used was "virtually identical to" the one the court had considered in Commonwealth v. Frey and had "determined not to infer to the jury a requirement of unanimity with respect to mitigating circumstances." Banks II, 656 A.2d at 470. It therefore rejected as "unfounded" Banks's claim that the verdict slip "impermissibly suggested to the jury that it must find mitigating circumstances by unanimous vote." Id.

The Pennsylvania Supreme Court then reviewed the poll by the foreman but determined that, because both the oral instructions and the instructions on the verdict slip were proper, the situation was distinguishable from Commonwealth v. Young, 572 A.2d 1217 (1990), resentencing after remand aff 'd, 651 A.2d 1313 (Pa. 1993), cert. denied, 511 U.S. 1012 (1994), in which the court had remanded for resentencing a case in which the oral instructions were inconsistent with the verdict sheet. See Banks II, 656 A.2d at 471. In Young, the jury charge required a sentence of death if "the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances." Young, 572 A.2d at 1228. The verdict sheet, however, indicated that "We, the jury, unanimously find that the defendant has proven the following mitigating circumstances by a preponderance of the evidence." Id. (Emphasis in original). The Pennsylvania Supreme Court found that "[t]his inconsistency requires a remand of this case for resentencing. . . ." Id. In contrast, in Banks II, the Pennsylvania Supreme Court found nothing in the verdict slip questions, or the jurors' responses, that would "indicate they believed they had to find mitigating circumstances unanimously." 656 A.2d at 471.

33

But, again, the court undertook a different inquiry from that required under Mills. Mills requires a court to assess whether a need for a unanimous finding of mitigating circumstances is one that "a reasonable jury could have drawn from . . . the verdict form employed." Mills, 486 U.S. at 375-76.

Here, we cannot help but find that a reasonable juror could so conclude. In fact, we believe the form itself does suggest the need for unanimity. The verdict form is a three-page document, containing two "numbered" statements:

> 1. We the jury unanimously sentence the defendant in the above matter to
>    X    Death
>         Life Imprisonment
>
> 2. (To be completed if the Sentence is Death) We the jury have found unanimously (emphasis added)
>
> _____ At least one aggravating circumstance a nd no mitigating circumstances. The aggravated circumstance(s) (is) (are):
>
> 1. ___ In the commission of the offense th e defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.
>
> 2. ___ The defendant has a significant his tory of felony convictions involving the use or threat of violence to the person.
>
> 3. ___ The defendant has been convicted of  another federal or state offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.
>
> Or
>
>  X One or more aggravating circumst ances which outweigh any mitigating circumstance or circumstances.

34

The aggravating circumstance(s) (is) (are):

1.    In the commission of th e offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

2.    The defendant has a sig nificant history of felony convictions involving the use of threat of violence to the person.

3.  X  The defendant has been con victed of another federal or state offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

The mitigating circumstance(s) (is) (are):

1.  X  The defendant was under th e influence of extreme mental or emotional disturbance.

2.    The capacity of the def endant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

3.    Any other mitigating ma tter concerning the character or record of the defendant or the circumstances of his offense.

Each form was marked as shown above and signed by the foreperson of the jury.

We find it only reasonable to conclude that the form itself is at least confusing, and more likely suggestive, regarding the need for unanimity as to mitigating circumstances. The lead-in language to the overarching second question is "We the jury have found unanimously . . . ." By implication, everything that follows was found unanimously. What follows is a reference both to aggravating and to mitigating circumstances, with no additional language that would imply that there is a different standard for aggravating circumstances than there is for mitigating circumstances.

35

There is also no language anywhere on the form from which the jury could infer that a mitigating circumstance might be marked if only one juror had found that circumstance to exist.

Thus, the structure and form of the verdict slip itself runs afoul of the dictates of Mills. Further, for the Pennsylvania Supreme Court to have ruled that there was no Mills violation without an examination of the content and implications of the verdict slip and without employing the proper inquiry was an unreasonable application of Mills.

iii. Jury Poll

Of the three elements -- the instructions, the verdict slip, and the jury poll -- the Pennsylvania Supreme Court opinion devoted the greatest attention to the polling of the jury, actually quoting the trial court's words. The polling questions and answers never used the term "unanimous" regarding the verdict or the finding of any of the aggravating or mitigating circumstances. While the jurors were asked whether they each found the "same" circumstances as the ones referred to before, it is difficult to say whether the questions were confusing in this regard. We do agree with the Pennsylvania Supreme Court in its view that the polling of a jury can compound the problem created by a questionable charge or verdict slip, as was the case in Young. Banks II, 656 A.2d at 471. Here, the polling does not appear either to add to or reduce the confusion as to the Mills problems we have already identified in the penalty phase instructions and verdict slip.

C. CONCLUSION

Because the Pennsylvania Supreme Court ruling regarding the application of Mills to the penalty phase instruction and verdict slip in Banks's trial was unreasonable, habeas relief will be granted and we will REVERSE the Order of the District Court and instruct it to GRANT a provisional writ of habeas corpus directed to the penalty phase. The Commonwealth of Pennsylvania may conduct a new sentencing hearing in a manner consistent

36

with this opinion within 120 days of this Order, or shall
sentence Banks to life imprisonment.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit